**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| The Brand Leader, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Kyle Duford, individually, Ghost, LLC, and The Brand Company LLC.<br><br>Defendants. | Civil Action No. ___________<br><br>COMPLAINT<br><br>(Jury Demand) |

Plaintiff The Brand Leader, Inc. ("Brand Leader"), by and through undersigned counsel, alleges as follows:

**THE PARTIES**

1. Plaintiff Brand Leader is a branding, advertising, marketing, creative, and design agency based in Greenville, South Carolina.

2. Brand Leader is a creative and advertising agency that assists businesses with developing, promoting, and growing their brands through an integrated combination of brand strategy, creative and design services, paid and earned media, public relations, web development, and content creation.

3. Kyle Duford ("Duford") is a resident of South Carolina and, upon information and belief, has an address of 6 Rollins Ave., Greenville, SC.

4. Duford was employed by Brand Leader around August of 2019.

5. During his employment, he held positions that included President from January 2023 to January 2025.

6. Although Duford was never a partner of Brand Leader, from January 2025 to December 2025 he referred to himself as a “Partner” of Brand Leader.

7. Duford separated from Brand Leader in December 2025, and his last day in the office at Brand Leader was December 15, 2025.

8. The Brand Company is a South Carolina limited liability company formed on 09/30/2025.

9. Its current website can be viewed at the URL http://brndcmpy.com.

10. The Brand Company lists its services to include advertising, copywriting, brand marketing, video production, brand consulting, marketing strategy, logo design, brand design, and ad design.

11. On LinkedIn and other social media, Duford represents that he began as The Brand Company’s Founder in September 2025. See Exhibit A.

12. Exhibit A is a true and correct copy of a screenshot of Duford’s LinkedIn profile identifying him as the Founder of The Brand Company beginning in September 2025.

13. Ghost LLC is a South Carolina limited liability company formed on 11/25/2025.

14. Upon information and belief, Ghost LLC holds itself out to the public as a creative agency offering services including brand strategy and positioning, branding and brand-identity development, design and art direction, website design and development, and custom artificial-intelligence and internal software tools.

15. Upon information and belief, Kyle Duford is an owner and officer of Ghost LLC.

16. Upon information and belief, although Ghost LLC was not registered as a limited liability company until November 25, 2025, the Ghost venture, operating under the Ghost and "weareghosts" names, was created at least one (1) year before Duford's separation from Brand Leader, while Duford remained employed by Brand Leader in a senior position of trust.

17. The domain name weareghosts.co, which is associated with Ghost LLC, was registered on November 14, 2024, more than one (1) year before Duford's separation from Brand Leader.

## JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction under the Lanham Act, 15 U.S.C. § 1125(a), a federal statute, giving this Court original jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367(a).

19. Defendants are subject to personal jurisdiction in South Carolina because Duford resides in South Carolina, Ghost, LLC and The Brand Company LLC are South Carolina limited liability companies, and the conduct alleged herein occurred in South Carolina.

20. Venue is proper in this District and the Greenville Division under 28 U.S.C. § 1391(b) because all Defendants reside here and a substantial part of the events giving rise to the claims occurred in Greenville, South Carolina.

## DUFORD'S POSITION OF TRUST

21. Duford began working with Brand Leader in or about 2019.

22. By at least September 2019, Duford was performing work in connection with Brand Leader and its client matters.

23. During his employment, Duford occupied a senior position through which he obtained access to Brand Leader's clients, prospective clients, personnel, creative work, marketing strategies, business information, software and technology resources, business-development opportunities, and other proprietary information and assets.

24. During Duford's employment, Brand Leader developed significant client relationships, goodwill, branding strategies, designs, websites, creative materials, portfolio pieces, business-development information, and related work product through the efforts of its employees and contractors.

**DUFORD EXPRESSLY AGREED TO PROTECT BRAND LEADER'S BUSINESS AND PROPERTY**

6. On August 29, 2024, Brand Leader and Duford entered into a written Key Employee Nondisclosure, Noncompetition and Nonsolicitation Agreement ("Agreement").

7. A true and correct copy of the executed Agreement is attached as Exhibit B.

8. In conjunction with, and as consideration for, his execution of the Agreement, Brand Leader gave Duford a new title of Partner of Brand Leader stated that this title would provide additional opportunities for client recruitment and development for Kyle.

9. Duford understood that his bonus compensation was tied to Brand Leader's profitability and that increased profitability would increase his bonus.

10. Duford therefore sought greater opportunities to recruit and develop clients and increase Brand Leader's profitability, and received the new title for that reason.

11. In Section 1(a) of the Agreement, Duford acknowledged that Brand Leader "has a proprietary interest in, and its business is one that requires secrecy concerning, 'Trade Secrets' and 'Proprietary Information.'"

12. The Agreement provides that such information "may include processes, formulas, data, computer programs, software and documentation, know-how, improvements, discoveries, developments, designs, algorithms, inventions, techniques, strategies, new products, marketing plans, forecasts, . . . prices, costs, lists of customers, clients, suppliers and employees, and any other information of a similar nature not available to the public," "whether or not expressly marked 'Confidential' or 'Proprietary.'"

13. Duford further acknowledged that such information is "the result of great effort and expense on the part of the Company" and is "critical to the success and survival of the Company."

14. Section 1(b) provides that "[a]ll Trade Secrets and Proprietary Information shall be the sole property of the Company, and the Company shall be the sole owner of all patents, copyrights, and other rights in connection therewith."

15. It further requires that, upon termination of employment "for any reason," Duford "will deliver to the Company all documents, notes, drawings, specifications, data, and other materials of any nature pertaining to my work with the Company and/or containing Trade Secrets and/or Proprietary Information, and I will not take with me any

of the foregoing, any reproduction of any of the foregoing, or any Trade Secrets and/or Proprietary Information that is embodied in a tangible medium of expression."

16. Under Section 1(c), Duford agreed to "hold Proprietary Information in confidence" and not to "divulge Proprietary Information to any Person at any time during the course of my employment and for a period of five (5) years after termination of employment (no matter how such termination occurs)."

17. Section 1(c) imposes no expiration on the protection of trade secrets:

18. Duford agreed to "hold Trade Secrets in confidence" and not to divulge them "to any individual, firm, corporation, or business entity ('Person') at any time, during or after termination of my employment with the Company."

19. Section 2 of the Agreement required Duford to "promptly disclose to the Company" all "processes, formulas, data, computer programs, software and documentation, know-how, improvements, discoveries, developments, designs, algorithms, inventions, techniques, strategies and new products (collectively, 'Inventions'), whether or not patentable or registrable under copyright or similar statutes," made or conceived during his employment "that are related to or useful in the business of the Company, result from tasks assigned to me by the Company, or result from the use of premises owned, leased, or contracted for by the Company."

20. Duford agreed that "all Inventions shall be the sole property of the Company," and stated: "I hereby assign to the Company any rights I may have or acquire in such Inventions."

21. The Inventions covered by Section 2 expressly include works "registrable under copyright or similar statutes," and Section 2 provides that "the Company shall be

the sole owner of all patents, copyrights, and other rights in connection therewith." Section 2 further requires Duford "to assist the Company in every proper way . . . to obtain and from time to time enforce patents, copyrights, and other rights and protections relating to said Inventions," an obligation that "shall continue beyond the termination of my employment."

22. Accordingly, all copyrights in copyrightable works that Duford created during his employment and that relate to or are useful in Brand Leader's business, including written works, designs, branding, and creative materials, belong to Brand Leader.

23. During his employment, Section 3 required Duford to "devote my full-time attention and energies to the diligent performance of my duties" and to "not engage in any activities that interfere with the performance of my duties to or otherwise represent a potential conflict of interest with my work for the Company."

24. Section 5(a) further provided that, during his employment, Duford would not, "directly or indirectly, individually or on behalf of any other Person (including, without limitation, as a member, manager, director, officer or employee of, or consultant to or owner of an interest in, any other entity) anywhere in the world provide services that are competitive with the services offered by the Company."

25. Under Section 4(a), Duford agreed that he "will not, for myself or on behalf of any Person, directly or indirectly recruit, offer employment or another service relationship to, or employ or otherwise engage any employee or independent contractor of the Company at any time during the course of my employment and for a period of two (2) years after termination of my employment (no matter how such termination occurs)."

26. The covered persons include "any individual or entity who was an employee or independent contractor of the Company at any time during the one (1) year period immediately preceding the termination of my employment."

27. The covered persons include Heuvel.

28. Under Section 4(b), Duford agreed that he "will not, for myself or on behalf of any Person other than the Company, directly or indirectly Solicit any Customer of the Company at any time during the course of my employment and for a period of two (2) years after termination of my employment." "Customer" includes "any actual or prospective customer of the Company" that Duford "Solicited during my employment," that employees he supervised Solicited, or "about whom I had access to the pricing, advertising and/or marketing schemes developed by the Company for such customer during my employment with the Company."

29. Section 4(b)(ii) defines "Solicit" to include "(A) soliciting, selling to, inducing, offering to sell to, contacting, or calling upon any Customer with a view to the sale of or providing of any business, services or products competitive with or similar to the Company's business; or (B) diverting or attempting to divert from the Company the business of a Customer or interfering with the Company's relationship with a Customer . . . ; or (C) providing information or assistance to a Person that would enable or help such Person to sell, offer to sell, or call upon a Customer of the Company."

30. Under Section 5(b), "[f]or a period of one (1) year after the termination of my employment with the Company," Duford agreed not to, "directly or indirectly, individually or on behalf of any other Person (including, without limitation, as a member, manager, director, officer or employee of, or consultant to or owner of an interest in, any

other entity) anywhere in the United States of America (the 'Territory')," "engage in, or assist any other Person to engage in," the businesses of "(A) branding; (B) advertising; (C) marketing; (D) public relations; (E) graphic and related brand design; (F) content development; or (G) website design and development; or (H) e-commerce," which Duford acknowledged "the Company is actively engaged in" (the "Prohibited Activities").

31. Section 5(c) extends that restriction to "two (2) years after the termination of my employment" to the extent the Prohibited Activities "involve the provision of services to any Person that is engaged in any of the Wine & Spirits/Beverage Industries."

32. In Section 5, Duford acknowledged that "as a trusted key employee of the Company, I will have access to the strategic plans of the Company and competitively sensitive marketing and pricing information" and that the restrictions "are reasonable to protect the interests of the Company."

33. In Section 6, he further acknowledged that "the limitations contained herein are reasonable and are not greater than necessary to protect the goodwill or other business interests of the Company," and in Section 8 that "the obligations of this Agreement survive the separation of my employment (no matter how it is achieved)."

34. Duford was not unaware of these obligations.

35. During negotiations, Duford advised Brand Leader that he had reviewed the restrictions with his own attorney and expressly acknowledged his understanding that the agreement restricted him from leaving Brand Leader and then soliciting or competing.

36. Duford subsequently confirmed in writing that he had signed and accepted the contractual terms and later reaffirmed that he signed the document provided to him without changes.

**BRAND LEADER'S CREATIVE ASSETS, TECHNOLOGY, AND BUSINESS OPPORTUNITIES**

16. During his employment, Duford participated in and obtained access to extensive Brand Leader client and creative work, including work involving Spero, ONZA/Majestic Beds, VintageView, Les Fumées Blanches, In Good Taste, Ventura County Coast, Carmichael Training Systems, and other Brand Leader projects.

17. Brand Leader serves clients throughout the United States, and Duford's work for Brand Leader was not limited to South Carolina.

18. During his employment, Duford worked on Brand Leader client matters at the national level, including for clients and prospective clients located in multiple states, and he participated in developing and pitching Brand Leader's branding, advertising, marketing, design, and website services to businesses across the country.

19. During his employment, Duford repeatedly stated that Brand Leader performed national-level work.

20. Duford actively pushed Brand Leader to target, pursue, and service national-level accounts, and he focused Brand Leader's business-development efforts on clients and prospective clients throughout the United States.

21. Because Duford himself directed Brand Leader toward a national client base, it should come as no surprise to Duford that the Agreement's restrictions extend to the national level.

22. The nationwide scope of those restrictions reflects the national market that Duford helped Brand Leader build and in which he competed on Brand Leader's behalf.

23. Duford also had direct access to Brand Leader's prospective business.

24. For example, a November 18, 2025 calendar event entitled "Meeting with Kyle at Brand Leader" concerned a Thompson Holdings, Inc. representative seeking a website redesign for Watermark Design Group following a referral arising from earlier work associated with Brand Leader.

25. The meeting link carried Duford's name.

26. Duford had substantial access to Brand Leader's technology resources as well.

27. In October 2025, Duford described Anthropic as Brand Leader's AI research tool and stated that he used it daily.

28. Duford further stated that he had built an audit tool and had "spun up" other tools.

29. Brand Leader's evidence further reflects that Duford transmitted prompts used for personal AI tools that included internal Brand Leader information.

30. Brand Leader's investment in publications associated with Duford did not begin with The Brand Book.

31. In or about 2021, while Duford was employed by Brand Leader, Brand Leader invested its funds, personnel, and resources in the development and publication of a book concerning Duford's personal story and experiences.

32. This resulted in the book Twice Found: Getting a Second Chance at Life, Love, and Understanding God released in 2021.

33. Although the subject matter of the 2021 book concerned Duford personally, Brand Leader paid expenses associated with its design, layout, production, and printing and used the resulting publication as a promotional and business-development tool for Brand Leader.

34. The 2021 publication established a course of dealing under which Brand Leader funded and supported book projects involving Duford not merely for Duford's personal benefit, but as commercial and promotional ventures intended to enhance Brand Leader's reputation, develop client relationships, and generate business for Brand Leader.

35. The Brand Book followed this established model. Brand Leader again devoted company funds, personnel, creative services, production resources, and distribution resources to the publication and marketed and distributed the book to existing and prospective Brand Leader clients as a means of promoting Brand Leader and generating business.

36. Accordingly, Duford understood from the parties' prior course of dealing that Brand Leader's investment in book projects associated with him was undertaken for Brand Leader's commercial benefit and was not a gratuitous investment in Duford's personal publishing activities.

37. Brand Leader also invested resources in *The Brand Book*.

38. The Brand Book was authored by Duford and Chris Heuvel while each was employed by Brand Leader.

39. Duford and Heuvel prepared The Brand Book within the scope of their employment with Brand Leader, using Brand Leader time, personnel, and resources, and for the purpose of promoting Brand Leader's business.

40. The Brand Book is therefore a work made for hire under 17 U.S.C. § 101.

41. Brand Leader is the author and owner of all copyrights in The Brand Book under 17 U.S.C. § 201(b).

42. Independently, to the extent any rights in The Brand Book did not vest in Brand Leader as a work made for hire, such rights were assigned to Brand Leader under the Agreement's assignment provisions as work product developed during Duford's employment that relates to Brand Leader's business and was developed using Brand Leader resources.

43. Brand Leader owns all rights, title, and interest, including all copyrights, in and to The Brand Book.

44. This book is a commercial Brand Leader venture: sales were connected to Brand Leader's Truist account, Brand Leader maintained a "Book Sales" accounting category, and Brand Leader intended the publication to generate business and client retention as well as book revenue. See Exhibit C.

45. Exhibit C is a true and correct copy of a communication from Brand Leader reflecting sales of The Brand Book.

46. Over a period of approximately two (2) years during his employment, Duford directed Brand Leader personnel to send copies of The Brand Book to Brand Leader clients and prospective clients.

47. Those shipments were made at Brand Leader's expense and were intended to secure and retain business for Brand Leader.

48. After his departure, Duford has been using The Brand Book, which is the property of Brand Leader, without Brand Leader's authorization to market and secure business for himself and his own competing businesses, including kyleduford.com. See Exhibit D.

49. Exhibit D is a true and correct copy of screenshots of kyleduford.com showing Duford's use of The Brand Book to market himself and his competing businesses.

50. While employed by Brand Leader, Duford created or caused to be created a social-media presence associated with a book titled Branding Without Permission and began publicly promoting the book and developing an audience around it.

51. On or about August 23, 2025, before his departure from Brand Leader, Duford registered the domain name brandingwithoutpermission.com.

52. In or about October 2026, Duford publicly stated that Branding Without Permission was "Two years in the making"  showing that it was in process while Duford was employed with Brand Leader. See Exhibit P.

53. Exhibit P is a true and correct copy of Duford's public statement describing Branding Without Permission.

54. Duford did not disclose to Brand Leader that he was separately establishing or controlling a commercial platform associated with a publication being developed, funded, promoted, and distributed using Brand Leader resources.

55. At the same time, Duford continued to cause Brand Leader to devote personnel, financial resources, client relationships, distribution channels, and other resources to developing and promoting the book as a Brand Leader commercial venture.

56. Upon information and belief, Duford has used Branding Without Permission, which was at least partially created while he was employed by Brand Leader, together with the goodwill and exposure generated through Brand Leader's investment in its book projects, to solicit, pursue, negotiate, or secure a publishing arrangement concerning Branding Without Permission.

57. Duford did not disclose the publishing opportunity to Brand Leader or afford Brand Leader the opportunity to participate in or receive the benefit of that opportunity.

58. To the extent Duford obtained for himself a publishing agreement, royalties, advances, speaking opportunities, consulting engagements, or other financial or commercial benefits arising from the book or from Brand Leader's investment in developing and promoting it, those benefits were obtained through conduct undertaken while Duford owed duties of loyalty and fidelity to Brand Leader and through the undisclosed appropriation of a business opportunity developed through Brand Leader's resources and goodwill.

**CONDUCT DURING THE FINAL MONTHS OF DUFORD'S EMPLOYMENT**

21. By December 5, 2025, while Duford remained employed by Brand Leader, Duford was publicly displaying Brand Leader-associated client work on his personal website, kyleduford.com.

22. The website displayed Spero work and identified Duford and Chris Heuvel as collaborators.

23. This activity was not limited to maintaining a private résumé.

24. Duford's personal website publicly presented his professional services and portfolio, including substantial work performed during his tenure at Brand Leader.

25. On December 7, 2025, before the conclusion of his relationship with Brand Leader, Duford used his personal Gmail account to send a departure communication to Brand Leader client contacts.

26. In that communication, Duford informed those contacts of his departure but emphasized that their "personal relationship" with him would continue and that he was "not walking away" from those relationships. See Exhibit E.

27. Exhibit E is a true and correct copy of the December 7, 2025 email Duford sent from his personal Gmail account to Brand Leader client contacts regarding his departure.

28. In early December 2025, Duford also directed Brand Leader personnel to send *The Brand Book* to two identified prospects.

29. Brand Leader's communications described shipments to prospective recipients in Florida and California at Duford's request. See Exhibit F.

30. Exhibit F is a true and correct copy of Brand Leader's accounting records reflecting the shipment of The Brand Book, at Duford's request, to prospective clients in Florida and California in December 2025.

31. Addra Labs, which does business as Addra Bars ("Addra Bars"), was a Brand Leader client. Over approximately two (2) years, Duford performed projects for

Addra Bars on behalf of Brand Leader, including packaging dielines and carton art in or about May and June 2024 and digital-marketing work under Statement of Work No. 1053, "ADDRA Labs Digital Marketing and Content Strategy," which Duford executed on Brand Leader's behalf as President on or about August 5, 2024, and which provided for a retainer from August 1, 2024 through December 31, 2025.

32. Through this work, Brand Leader developed Addra Bars' brand, packaging, and related creative work at discounted rates.

33. The decision to deeply discount Brand Leader's work for Addra Bars was Duford's.

34. Duford contended that the arrangement was good for Brand Leader because it would strengthen Brand Leader's portfolio and help Brand Leader attract additional active-lifestyle brands.

35. Duford further represented to Brand Leader that when Addra Bars obtained additional funding, whether through growth, an investor, or otherwise, Addra Bars would spend more with Brand Leader and engage Brand Leader for additional and more substantial work.

36. In the fourth quarter of 2025, Duford, as the Brand Leader leader responsible for new business, reported to Brand Leader as late as December 2025 that Addra Bars had secured an investor and might sign a new project contract with Brand Leader.

37. Several months after his separation from Brand Leader, Duford informed Brand Leader that Addra Bars was among the new business opportunities he was working on and that he had a call with Addra Bars.

38. Duford stated that Addra Bars had obtained an investor, and he represented that he was going to meet with Addra Bars to bring its business to Brand Leader.

39. Within a few weeks after Duford's separation from Brand Leader, Addra Bars began running new social-media advertisements, which were served to Brand Leader personnel through retargeting.

40. One of those advertisements features a young woman holding an Addra Bars product.

41. That individual is Duford's stepdaughter.

42. Brand Leader never heard back from Addra Bars regarding the anticipated new project contract.

43. Brand Leader later discovered that Addra Bars was working with Duford or one of his companies.

44. On or about March 4, 2026, a GS1 US renewal notice was delivered to Duford's former Brand Leader email account.

45. GS1 US is the registry that issues product barcodes, and the notice reflected that the GS1 account for "Addra Labs" was held under Kyle Duford's name personally.

46. Upon information and belief, Duford personally registered Addra Bars' product barcodes, reflecting a personal relationship with Addra Bars beyond that of a Brand Leader account lead, which he did not disclose to Brand Leader.

47. Duford diverted the Addra Bars opportunity, which arose from Brand Leader's client relationship and Brand Leader's deeply discounted work and which

Duford had represented would return to Brand Leader once Addra Bars obtained funding, to himself or to a competing enterprise with which he is associated.

48. This was simply fraud.

49. While employed by Brand Leader and subject to the Agreement, Duford serendipitously created the Toxxic Coffee brand.

50. Duford did not disclose Toxxic Coffee to Brand Leader before its launch, and Brand Leader did not learn of the brand until it was already live.

51. When Brand Leader asked Duford about Toxxic Coffee, Duford stated that he had launched it on his own as moonlighting and as a side hustle.

52. Duford's surreptitious creation and launch of Toxxic Coffee during his employment was contrary to his obligation to devote his full-time attention to Brand Leader and to refrain from activities that interfered with his duties or created a potential conflict of interest.

53. Upon information and belief, the Toxxic Coffee brand, including its branding, design, and related creative work, was developed during Duford's employment, relates to or is useful in Brand Leader's business, and was developed in whole or in part using Brand Leader time and resources, and therefore belongs to Brand Leader under the Agreement's assignment provisions.

54. Duford has since displayed Toxxic Coffee in his personal portfolio and allowed The Brand Company and Ghost to display it in their commercial portfolios to promote competing agency services.

55. Taken together, these communications demonstrate that immediately before separation Duford possessed and was actively utilizing Brand Leader client

relationships, prospective-client relationships, company-supported promotional materials, and business-development channels.

**SEPARATION AND BRAND LEADER'S DEMAND FOR RETURN OF ITS PROPERTY**

27. On December 15, 2025, Brand Leader provided Duford a written separation summary documenting the end of his employment and requiring him to complete the transfer of Brand Leader property. See Exhibit G.

28. Exhibit G is a true and correct copy of the December 15, 2025 written separation summary Brand Leader provided to Duford.

29. Among other things, Brand Leader expressly demanded the transfer and return of company property in Duford's possession or control, including log-in credentials, passwords, software licenses or access, inventions, financial information, and related company property.

30. On December 22, Brand Leader unequivocally instructed Duford to return the company laptop. Duford replied, "Sure thing, it's been waiting for you." See Exhibit H.

31. Exhibit H is a true and correct copy of the December 2025 communications between Brand Leader and Duford regarding the return of the company laptop.

32. On information and belief, Duford retained, copied, transmitted, reproduced, incorporated into later products, or continued to use Brand Leader digital files, creative materials, source materials, confidential information, AI-related materials, AI agents, or other company property after Brand Leader demanded its return.

## DUFORD IMMEDIATELY ENTERS THE COMPETITIVE AGENCY BUSINESS

32. Approximately one (1) month after separation, on January 14, 2026, Barrett Hofherr publicly announced Duford's appointment as Associate Partner and Director of Client Strategy & Services.

33. The announcement identified Brand Leader as his most recent employer and described Duford's experience in client strategy, branding, and related services.

34. Barrett Hofherr subsequently rebranded as Optimism BH.

35. Optimism BH, and formerly Barrett Hofherr, is an independent, full-service advertising and creative agency that provides brand strategy, creative development, advertising, campaign development and execution, and data-informed marketing services.

36. The agency describes its services as combining strategy, creative, and data to build what it calls "brand momentum."

37. Its publicly displayed work includes brand-identity projects, brand campaigns, commercials, product-launch campaigns, and other advertising and creative services for national consumer and technology brands.

38. These services substantially overlap with services offered by The Brand Leader.

39. Upon information and belief, Optimism BH assisted Duford in violating Brand Leader's rights by engaging him in a senior client-facing position during the restricted periods under the Agreement and by allowing him to provide branding, advertising, marketing, and related agency services that compete with Brand Leader's services, in contravention of Duford's obligations to Brand Leader.

40. Duford therefore entered a senior client-facing position with another agency during the one (1) year period in which the Agreement restricted specified competitive agency services.

41. Duford's competitive activity thereafter expanded or continued through additional ventures publicly offering branding, design, research, AI, strategy, website, and creative-agency services.

42. One such enterprise publicly identifies itself as The Brand Company, LLC. Its website describes the enterprise as an independent Greenville brand, design, research, and AI agency and solicits projects and calls from prospective customers.

43. Duford intentionally selected this name to unfairly compete and cause confusion with existing and potential customers of Brand Leader's services and potential customers.

44. Brand Leader location signage:




45. Defendant Duford's Linked In Page:




| Plaintiff Brand Leader Logo | Defendant Duford Logo |
|---|---|
| The Brand Leader® | THE BRAND COMPANY |

46. The Brand Company publicly offers services materially overlapping Brand Leader's business, including brand strategy, design, websites, and custom AI tools.

47. Another enterprise, Ghost LLC, publicly represents itself as a creative agency.

48. The Ghost, LLC site identifies Duford and Chris Heuvel as its two principals, assigning Duford responsibility for strategy and Chris Heuvel responsibility for creative execution, art direction, and design systems. See Exhibit I.

49. Exhibit I is a true and correct copy of screenshots of Ghost's website identifying Duford and Chris Heuvel as its two principals and describing their respective roles.

50. Heuvel is, and at all relevant times has been, a current employee of Brand Leader. Like all Brand Leader employees, Heuvel owes Brand Leader a duty of loyalty, which prohibits him from performing competing work, including through moonlighting or side work, for a competing agency while employed by and compensated by Brand Leader.

51. Ghost's public website contains posts dated November 2025, December 2025, January 2026, and February 2026, including posts made while Duford remained employed by Brand Leader and shortly after his separation. See Exhibit J.

52. Exhibit J is a true and correct copy of screenshots of posts on Ghost's public website dated November 2025 through February 2026.

53. The website for Ghost, LLC states, "Ghost is a creative agency in Greenville, South Carolina. We're small by design and senior all the way through — the work you buy is the work we make."

54. The website of Ghost, LLC invites prospective customers to "Book a Call." See Exhibit K.

55. Exhibit K is a true and correct copy of a screenshot of Ghost's website inviting prospective customers to "Book a Call."

56. Ghost's public presentation of Duford and Heuvel, a covered Brand Leader employee, as its two principals occurred during the two (2) year period in which Duford had agreed not to recruit, employ, offer a service relationship to, or otherwise engage covered Brand Leader employees and contractors.

57. The nature, timing, compensation, communications, formation, and actual working relationship among Duford, Chris Heuvel, Ghost LLC, and The Brand Company

are matters peculiarly within Defendants' and their associates' knowledge and will be established further through discovery.

**DEFENDANTS USE BRAND LEADER WORK**

**TO MARKET COMPETING BUSINESSES**

41. Following his departure, Duford maintained an extensive personal portfolio containing numerous projects associated with Brand Leader clients or work created during his employment at Brand Leader.

42. Those materials included, but were not limited to, work associated with Spero, ONZA, Les Fumées Blanches, In Good Taste, Verdeco, VintageView, Carmichael Training Systems, Ventura County Coast, and numerous other Brand Leader-associated projects. See Exhibit M.

43. Exhibit M is a true and correct copy of screenshots of Duford's personal portfolio website displaying projects associated with Brand Leader clients or created during his employment at Brand Leader.

44. Further, the materials associated with the Toxxic Coffee brand, which Duford surreptitiously created during his employment without disclosure to Brand Leader, belong to Brand Leader under the Agreement.

45. Duford did not merely identify past employment. On several portfolio pages, he used first-person representations concerning the underlying work. For example, his ONZA page stated, "I renamed this ONZA" from Majestic Beds.

46. Duford's personal portfolio also displays the "Yippie-Ki-PA & Rage Against the Ravine" project, on which **THE Brand Leader** name and Brand Leader monogram remain visibly displayed.

47. This constitutes direct evidence that Duford is using material visually incorporating Brand Leader's branding to promote his own professional portfolio and services.

48. The Brand Company likewise publicly presents former Brand Leader-related projects in its own commercial portfolio, including but not limited to ONZA, Les Fumées Blanches, VintageView, Verdeco, In Good Taste, and Spero, as well as the Toxxic Coffee brand that Duford surreptitiously created during his Brand Leader employment.

49. The Brand Company's Spero materials are particularly significant. Its commercial website identifies Duford, but not Brand Leader, as part of the project team and affirmatively states that "we" gave Spero a full transformation.

50. Those pages go beyond displaying a finished logo. They contain project-process materials, mockups, descriptions of development from sketches through launch, and other materials associated with the Spero engagement.

51. Duford himself had previously acknowledged that Spero came to Brand Leader more than a decade before 2025 and had attributed Spero design work to Chris Heuvel.

52. Ghost likewise publicly displays former Brand Leader-related projects, including but not limited to Les Fumées Blanches, Carmichael Training Systems, and ONZA, as well as the Toxxic Coffee brand that Duford surreptitiously created during his Brand Leader employment.

53. Through these competing commercial websites, Duford and the competing ventures have therefore used Brand Leader-associated client work, creative assets,

project histories, and goodwill as credentials to promote and obtain competing agency business.

54. Since his separation, Duford has used The Brand Book to secure business for himself and for his affiliated platforms and entities, including kyleduford.com, Ghost, and The Brand Company.

55. Upon information and belief, Duford has also used The Brand Book to promote paid speaking engagements and to market and sell branding work and artificial-intelligence tools for his own benefit and the benefit of those entities.

56. Brand Leader receives no compensation or other value from Duford's post-separation use of The Brand Book, even though Brand Leader funded the publication and its distribution and developed it as a Brand Leader commercial venture to generate business for Brand Leader.

**TRADEMARK AND SOURCE-IDEN**TIFICATION HARM

51. Brand Leader conducts business using the THE Brand Leader name and mark, under which it has developed goodwill through its branding, design, advertising, and related agency work.

52. Brand Leader is the owner of United States Federal Trademark Registration 7,153,631 filed Jan. 10, 2022 and registered Sep. 05, 2023. See Exhibit L.

53. Exhibit L is a true and correct copy of the certificate of registration for United States Trademark Registration No. 7,153,631 for THE Brand Leader mark.

54. During the restricted period, The Brand Company entered the same branding and design marketplace under the name THE BRAND COMPANY and publicly offered overlapping brand strategy, design, website, and related agency services.

55. The Brand Company has simultaneously displayed work associated with Brand Leader customers and projects on its own commercial website and, in the case of Spero, has affirmatively described itself in collective terms as responsible for the client's "full transformation."

56. The use of a closely structured leading text "THE BRAND" identity, overlapping agency services, Brand Leader-associated client work, and the presentation of that work as the competing business's own work is likely to cause customers and prospective customers to believe that The Brand Company, Duford, their services, or their portfolio is affiliated with, sponsored by, derived from, or otherwise associated with Brand Leader.

57. The foregoing conduct has appropriated or threatens to appropriate the goodwill associated with Brand Leader and its work and creates a likelihood of confusion concerning the source, sponsorship, affiliation, and origin of the parties' competing services.

**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS**

57. Through his senior positions, Duford had authorized access to nonpublic information concerning Brand Leader's clients and prospects, business-development pipeline, internal strategies and processes, software and AI resources, work product, and other confidential commercial information.

58. The Agreement itself expressly identifies protected categories including client information, marketing plans, pricing, designs, strategies, and software.

59. Brand Leader took steps to protect such information through, among other measures, contractual confidentiality obligations and contractual requirements requiring

Duford to return materials and company property and prohibiting continued use of qualifying Trade Secrets and Proprietary Information following his employment.

60. Duford had direct access to specific prospective-customer information. The November 2025 Thompson Holdings/Watermark matter, for example, disclosed internally a prospective customer's identity, contemplated website project, referral history, and meeting information.

61. Duford also developed and used AI-related tools while employed, acknowledged daily use of Brand Leader's AI research resource, and stated that he had developed an audit tool and other tools.

62. Following his departure, Duford and/or an associated competing enterprise advertised AI-powered and "custom AI" capabilities alongside services competing directly with Brand Leader.

63. On information and belief, Duford retained, used, disclosed, incorporated, or benefited from Brand Leader confidential or proprietary materials in building, operating, and marketing his competing activities.

**BREACH OF LOYALTY AND DIVERSION OF CORPORATE OPPORTUNITIES**

64. During his employment, Duford owed duties arising from his position as a senior Brand Leader officer and employee, including the obligation to act in Brand Leader's interests rather than use his employment position, Brand Leader personnel, assets, confidential information, or business opportunities for a competing enterprise.

65. Notwithstanding those obligations, while still employed Duford developed and publicly maintained a personal professional platform displaying Brand Leader-associated client work; maintained direct control of or access to Brand Leader client and

prospect relationships; developed AI tools or products while using Brand Leader AI resources; and communicated with Brand Leader clients and prospects regarding his impending departure and relationships with them.

66. On December 7, 2025, while still associated with Brand Leader, Duford specifically contacted Brand Leader client contacts through his personal email account and emphasized that his relationships with them would survive his departure.

67. On December 8, 2025, Duford communicated separately with a Brand Leader prospect concerning an outstanding business opportunity after announcing his departure.

68. Within approximately one month, Duford publicly assumed a senior client-strategy position with a competing agency and thereafter became publicly associated with additional businesses offering the same or substantially similar branding, design, web, strategy, creative, and AI services that Brand Leader sells.

69. Duford and those businesses subsequently used Brand Leader-associated work and relationships as commercial credentials to solicit competitive agency business.

70. The timing and continuity of that activity, together with Duford's pre-separation client communications, personal portfolio, tool development, and immediate post-separation competition, show that Duford's competing enterprise and business-development activity were undertaken, prepared, or facilitated while he remained obligated to act loyally for Brand Leader.

71. Defendants altered a photograph taken at the site of a Brand Leader client during Brand Leader's work for that client by adding THE BRAND COMPANY logo or mark to the jacket worn by Kyle Duford.

72. The original image was taken years before Duford's departure from Brand Leader.

73. Defendants Duford and THE BRAND COMPANY have publicly displayed the altered photograph on The Brand Company's website at https://brndcmpy.com/about. See Exhibit N.

74. In the original photograph, the jacket worn by Duford did not have THE BRAND COMPANY logo or mark, nor did this logo or mark appear anywhere in the photograph.

75. The altered photograph has been displayed on The Brand Company's website within the one-year period under Section 5(b) of the Agreement and the two-year period under Section 4 of the Agreement following Duford's separation from Brand Leader.

76. The two individuals in the photograph are current employees of Brand Leader.

77. Neither of the Brand Leader employees depicted in the photograph consented to the alteration of the photograph, to the addition of THE BRAND COMPANY logo or mark, or to the use of their images to advertise or promote The Brand Company or any other business competing with Brand Leader.

78. Defendants altered the photograph and displayed it publicly without the knowledge, permission, or authorization of the depicted Brand Leader employees or of Brand Leader.

79. Defendants used the images and likenesses of the two Brand Leader employees depicted in the photograph for advertising and commercial purposes, including to promote The Brand Company's competing agency services, without the permission or consent of either employee.

80. Defendants' unauthorized use of the employees' likenesses falsely suggested to the public, including Brand Leader's existing and prospective clients, that those Brand Leader employees were affiliated with, worked for, or endorsed The Brand Company.

81. The doctored photograph was a knowing and intentional misrepresentation.

82. By adding THE BRAND COMPANY logo or mark to a photograph taken at the site of a Brand Leader client and depicting current Brand Leader employees, Defendants falsely represented to the public, including Brand Leader's existing and prospective clients, that The Brand Company was responsible for the photo shoot and the underlying work and that the depicted Brand Leader employees were affiliated with The Brand Company.

83. Defendants knew those representations were false when made, because the photograph arose from Brand Leader's work, the depicted individuals were and remain Brand Leader employees, and THE BRAND COMPANY logo or mark did not appear in the original photograph.

84. Defendants made those false representations with the intent that existing and prospective clients rely on them in selecting The Brand Company for branding, design, and related agency services, and with the intent to divert business and goodwill from Brand Leader to The Brand Company.

85. Defendants' alteration and public display of the doctored photograph was therefore fraudulent, deceptive, and dishonest.

86. The following is a true and correct copy of the doctored photograph that is displayed on the website of THE BRAND COMPANY:



71. The above photograph is a true and correct copy of the black-and-white photograph as it appears on the website for THE BRAND COMPANY. See Exhibit N.

72. Exhibit N is a true and correct copy of the webpage found under the URL https://brndcmpy.com/about.

73. The image below is an enlarged portion of the same photograph, showing the altered jacket bearing THE BRAND COMPANY logo or mark as it appears on THE BRAND COMPANY website.




74. The logo decidedly does NOT say THE BRAND LEADER.

**WRONGFUL POSSESSION AND USE OF Brand Leader PROPERTY**

75. Brand Leader owned physical and digital property entrusted to Duford during his employment, including a company laptop and company business information and materials.

76. Upon separation, Brand Leader expressly demanded the return and transfer of its property, credentials, licenses, access, inventions, and other company materials. See Exhibit G.

77. Duford acknowledged possessing the company laptop and initially sought to purchase it rather than return it. Brand Leader rejected that proposal and directed that the laptop be returned. See Exhibit H.

78. Thereafter, materials associated with Brand Leader projects appeared repeatedly on Duford's personal website and on competing commercial websites associated with his post-Brand Leader activities.

79. On information and belief, to the extent Duford retained copies of Brand Leader source files, proprietary work product, photographs, software, credentials, business records, or other tangible or electronically stored Brand Leader property after termination and used that property for his own or a competing enterprise's benefit, such retention and use was without Brand Leader's authorization and contrary to Brand Leader's ownership rights and Duford's contractual return obligations.

80. Duford's activities infringe Brand Leader's copyrights.

## CONTINUING HARM

76. Duford's conduct has not been confined to a historical departure dispute. During 2026, his personal website, The Brand Company, and Ghost continued publicly advertising overlapping agency services and displaying Brand Leader-associated work.

77. The activities have occurred while substantial provisions of Duford's Agreement remain operative, including the contractual protection of Proprietary Information and Trade Secrets and the two-year employee/contractor and customer nonsolicitation restrictions; the special beverage-sector restriction also remains within its contractual term.

78. Unless restrained, Defendants' continued use of Brand Leader's goodwill, work product, confidential information, personnel relationships, marks, and client history threatens to impair Brand Leader's customer relationships, competitive position, employee relationships, intellectual-property interests, and goodwill.

79. Brand Leader has been damaged by Duford's breaches and wrongful conduct in amounts to be established through discovery and trial, including, as applicable, lost business opportunities and profits, loss or impairment of the exclusive value of its confidential information and work product, unjust benefits obtained through the use of Brand Leader assets, and injury to Brand Leader's goodwill.

80. Brand Leader seeks all legal and equitable relief available for Duford's breach of contract, breach of duties owed to Brand Leader, misappropriation of qualifying trade secrets and confidential information, wrongful possession or use of Brand Leader property, and infringement and unfair competition arising from the unauthorized commercial use of Brand Leader's marks, work, and goodwill.

## DUFORD'S INTENTIONAL USE OF BRAND LEADER'S DISTINCTIVE STUDIO AS A BRAND ASSET

81. Brand Leader's offices in Greenville, South Carolina are in a building that Brand Leader bought and renovated, converting a former studio and radio station into its creative agency.

82. When it renovated the building, Brand Leader deliberately kept the original midcentury modern character of one room, including its original wood paneling, which gives the room a distinctive "Mad Men" era look and feel.

83. The paneled room and its original wood paneling are a well-known part of Brand Leader's identity and a central part of Brand Leader's brand story.

84. Brand Leader regularly takes clients and prospective clients through the building, and the paneled room is a featured part of that tour and of the story of Brand Leader's conversion of a studio and radio station into an agency.

85. The public recognition of the room as part of Brand Leader's brand is shown by the fact that Brand Leader's building was included in the annual midcentury modern tour of homes gvclmod, as the only commercial building on the tour, and the paneled room was a highlight of the tour.

86. The paneled room is therefore associated with Brand Leader in the minds of Brand Leader's clients, prospective clients, and the relevant community, and it identifies Brand Leader's studio and Brand Leader's work.

87. Duford knew this. During his years in senior positions at Brand Leader, Duford took part in, saw, or knew of client tours of Brand Leader's building and the brand story told about the paneled room, and he knew that the room was a distinctive part of Brand Leader's brand identity.

88. Defendants nonetheless have publicly displayed a photograph taken inside Brand Leader's paneled room, showing its distinctive original wood paneling, in connection with the promotion of The Brand Company, Duford, or their competing agency services at https://kyleduford.com/about. See Exhibit O.

89. Exhibit O is a true and correct copy of the photograph, as displayed by Defendants, showing the distinctive wood paneling of Brand Leader's studio.

90. Brand Leader did not authorize Defendants to use images of its studio, including the paneled room, to advertise or promote any business competing with Brand Leader.

91. By using imagery of a room that clients and prospective clients recognize as part of Brand Leader's studio and brand story, without identifying Brand Leader, Defendants falsely suggest that the work, the workspace, or the creative environment shown belongs to or is associated with The Brand Company or Duford's competing ventures.

92. This trades on Brand Leader's goodwill and adds to the likelihood of confusion about the source, sponsorship, and affiliation of Defendants' services.

93. Defendants' use of the paneled-room photograph, together with the doctored photograph and the Brand Leader-associated portfolio work described above, is part of a deliberate pattern of using Brand Leader's identity, people, places, and work to present Defendants' competing businesses as the continuation of, or as affiliated with, Brand Leader.

94. Defendants' actions, especially Duford's are intentionally and willful.

## FIRST CAUSE OF ACTION — FEDERAL TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114

95. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

96. Plaintiff The Brand Leader, Inc. is the owner of the THE Brand Leader name and mark, under which it provides branding, advertising, marketing, creative, and design agency services.

97. Plaintiff owns United States Trademark Registration No. 7,153,631 for the THE Brand Leader mark, which was registered on September 5, 2023. See Exhibit L.

98. Plaintiff's certificate of registration is prima facie evidence of the validity of the registered mark, of Plaintiff's ownership of the mark, and of Plaintiff's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate. 15 U.S.C. §§ 1057(b), 1115(a).

99. Defendants Kyle Duford, Ghost, LLC, and The Brand Company LLC have used in commerce, without the consent of Plaintiff, a colorable imitation of Plaintiff's registered mark in connection with the sale, offering for sale, distribution, or advertising of services. 15 U.S.C. § 1114(1).

100. Specifically, Defendants adopted and used the mark THE BRAND COMPANY to promote competing branding, design, and website services. Defendant The Brand Company LLC publicly advertises these competing services, including brand strategy and custom artificial-intelligence tools, on its commercial website.

101. Defendants' unauthorized use of THE BRAND COMPANY is likely to cause confusion, or to cause mistake, or to deceive consumers regarding the affiliation, origin, or sponsorship of Defendants' services. 15 U.S.C. § 1114(1).

102. This likelihood of confusion is intentionally compounded by Defendants' use of Plaintiff-associated client work and creative assets as commercial credentials for their competing businesses. For example, Defendant Duford's personal professional website displays project work that visibly incorporates Plaintiff's branding, including THE Brand Leader name and Brand Leader monogram.

103. Defendants committed these acts of infringement with knowledge that their colorable imitation is intended to be used to cause confusion, or to cause mistake, or to deceive. 15 U.S.C. § 1114(1).

104. As a direct and proximate result of Defendants' trademark infringement, Plaintiff has suffered and continues to suffer damages, including lost business opportunities, lost profits, and injury to its goodwill and reputation.

**SECOND CAUSE OF ACTION — FALSE DESIGNATION OF ORIGIN**

105. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

106. Brand Leader owns and uses the THE Brand Leader name and mark in connection with, among other things, its branding, advertising, marketing, creative, design, web-development, and related agency services, and has developed goodwill under that mark.

107. Brand Leader owns United States Trademark Registration No. 7,153,631 for THE Brand Leader, registered on September 5, 2023.

108. Defendant The Brand Company entered the branding and design marketplace under the name THE BRAND COMPANY and offers services materially overlapping Brand Leader's services, including brand strategy, design, website services, and artificial-intelligence tools.

109. Defendants have used THE BRAND COMPANY and Brand Leader-associated client work in commercial portfolios and solicitations for competing agency services. The Brand Company publicly displays work associated with Brand Leader clients and projects, including but not limited to ONZA, Les Fumées Blanches,

VintageView, Verdeco, In Good Taste, and Spero, as well as the Toxxic Coffee brand that Duford surreptitiously created during his Brand Leader employment.

110. In connection with its Spero portfolio, The Brand Company identifies Duford, but not Brand Leader, as part of the project team; states that "we" gave Spero a "full transformation"; and displays project-process materials, mockups, descriptions, and other materials associated with the Spero engagement.

111. Duford's personal portfolio also displays Brand Leader-associated work while promoting his professional services, including a project on which the THE Brand Leader name and Brand Leader monogram remain visibly displayed.

112. Defendants' use in commerce of THE BRAND COMPANY, a closely structured "THE BRAND" identity, together with Brand Leader-associated client work and project histories, is likely to cause confusion, mistake, or deception as to the affiliation, connection, association, origin, sponsorship, or approval of Defendants' services and commercial activities by Brand Leader.

113. Defendants' conduct is likely to cause customers and prospective customers to believe that The Brand Company, Duford, Defendants' services, or Defendants' commercial portfolio is affiliated with, sponsored by, derived from, approved by, or otherwise associated with Brand Leader.

114. Defendants' conduct has damaged, and unless restrained will continue to damage, Brand Leader through the appropriation of Brand Leader's goodwill and through confusion concerning the source, sponsorship, affiliation, and origin of the parties' competing services.

115. The Brand Company designation is visually, phonetically, and commercially similar to Brand Leader's THE Brand Leader mark.

116. Visually, both begin with the identical dominant phrase "THE BRAND" and present a substantially similar brand identity in the same marketplace.

117. Phonetically, the names sound alike because they share the same opening words and cadence, with only the final term differing.

118. Commercially, both are used in connection with branding, design, marketing, website, and related creative-agency services, such that consumers encountering THE BRAND COMPANY are likely to perceive it as affiliated with, sponsored by, derived from, or otherwise connected to THE Brand Leader.

119. Duford owns, directs, and controls The Brand Company and has the authority and practical ability to control its operations, branding, marketing, portfolio, and use of the THE BRAND COMPANY designation.

120. Duford publicly represents that he founded The Brand Company in September 2025, intentionally selected the company's name, and is identified as a member of the project team for Brand Leader-associated work displayed on The Brand Company's commercial website. See Exhibit A.

121. Duford personally authorized, directed, controlled, and participated in The Brand Company's use of the THE BRAND COMPANY designation and Brand Leader-associated client work to advertise and promote competing services.

122. Duford is therefore individually and personally liable for his own participation in the false designation of origin and resulting likelihood of confusion, independently of The Brand Company's liability.

123. Section 1125(a) imposes civil liability upon any person who uses in commerce a false designation of origin likely to cause confusion regarding affiliation, connection, association, origin, sponsorship, or approval. See 15 USCS § 1125.

124. Defendants Duford and The Brand Company are liable to Brand Leader for false designation of origin under 15 U.S.C. § 1125(a)(1)(A), which imposes civil liability for use in commerce of a word, term, name, symbol, device, false designation of origin, or false or misleading representation of fact that is likely to cause confusion, mistake, or deception regarding affiliation, connection, association, origin, sponsorship, or approval.

**THIRD CAUSE OF ACTION — BREACH OF CONTRACT AGAINST DUFORD**

125. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

126. On August 29, 2024, Brand Leader and Duford entered into the written Key Employee Nondisclosure, Noncompetition and Nonsolicitation Agreement (the “Agreement”). The Agreement was supported by consideration and imposed contractual duties upon Duford. A true and correct copy of the executed Agreement is attached as Exhibit B.

127. Brand Leader performed its obligations under the Agreement, including employing Duford in senior positions, providing him access to Brand Leader’s business opportunities, client and prospective-client relationships, proprietary information, technology resources, and creative work, and compensating him during his employment.

128. Among other obligations, the Agreement required Duford to protect Brand Leader's Trade Secrets and Proprietary Information (Agreement § 1(c)); upon termination, "deliver to the Company all documents, notes, drawings, specifications, data, and other materials of any nature pertaining to my work with the Company" (id. § 1(b)); and not "take with me any of the foregoing, any reproduction of any of the foregoing, or any Trade Secrets and/or Proprietary Information" (id.).

129. The Agreement's proprietary-information obligations continue for five years after employment, and its protection of qualifying trade secrets does not expire.

130. Under Section 2, the Agreement also assigned to Brand Leader qualifying Inventions that Duford developed during his employment, including software, designs, techniques, strategies, and new products "related to or useful in the business of the Company," resulting "from tasks assigned to me by the Company," or resulting from the use of Company premises, and Duford agreed that "all Inventions shall be the sole property of the Company."

131. Section 4(a) of the Agreement prohibited Duford, for two years after termination, from directly or indirectly recruiting, offering "employment or another service relationship to," or employing "or otherwise engag[ing] any employee or independent contractor of the Company."

132. During that same period, Section 4(b) prohibited him from soliciting covered Brand Leader customers and prospective customers, including persons he had solicited or about whom he "had access to the pricing, advertising and/or marketing schemes developed by the Company."

133. Section 4(b)(ii) defined prohibited solicitation to include “contacting,” “diverting or attempting to divert from the Company the business of a Customer,” “interfering with the Company’s relationship with a Customer,” and “providing information or assistance to a Person” to enable it to do so.

134. Section 5(b) of the Agreement further prohibited Duford, for one year after separation, from directly or indirectly engaging in or assisting any other Person to engage in branding, advertising, marketing, public relations, graphic and related brand design, content development, website design and development, or e-commerce “anywhere in the United States of America.”

135. The nationwide scope of Section 5(b) is reasonable and was expected by Duford.

136. During his employment, Duford repeatedly stated that Brand Leader performed national-level work, actively pushed Brand Leader to target, pursue, and service national-level accounts, and focused Brand Leader’s business-development efforts on clients and prospective clients throughout the United States.

137. Because Duford himself directed Brand Leader toward a national client base, the Agreement’s nationwide restrictions reflect the national market that Duford helped Brand Leader build and in which he competed on Brand Leader’s behalf.

138. Duford understood and accepted these obligations.

139. Before execution, Duford stated that he had reviewed the restrictions with his own attorney and understood that the Agreement restricted his ability to leave Brand Leader and solicit or compete.

140. Duford thereafter confirmed in writing that he had signed and accepted the Agreement without changes.

141. Duford breached the Agreement by failing to return all Brand Leader property and materials upon separation and by retaining, copying, transmitting, reproducing, incorporating into later products, or continuing to use Brand Leader digital files, creative materials, source materials, confidential information, AI-related materials, AI agents, or other company property after Brand Leader demanded their return.

142. Brand Leader's December 15, 2025 separation summary required Duford to transfer and return Brand Leader property in his possession or control, including log-in credentials, passwords, software licenses or access, inventions, financial information, and related company property.

143. On December 22, 2025, Brand Leader specifically instructed Duford to return the company laptop, which Duford acknowledged possessing.

144. Duford further breached the Agreement by using Brand Leader-associated creative work, source materials, project histories, and goodwill as commercial credentials to market his personal professional services and competing agency businesses.

145. After departing Brand Leader, Duford's personal portfolio and the commercial portfolios of The Brand Company and Ghost publicly displayed numerous projects associated with Brand Leader clients or developed during Duford's employment with Brand Leader, including but not limited to Spero, ONZA, Toxxic Coffee, Les Fumées Blanches, In Good Taste, Verdeco, VintageView, Carmichael Training Systems, and Ventura County Coast.

146. Duford also breached the Agreement's competitive-services restriction by entering a senior client-facing position with a competing agency approximately one month after his separation from Brand Leader and by becoming publicly associated with The Brand Company and Ghost, enterprises that offer branding, design, strategy, website, creative-agency, and AI-related services overlapping Brand Leader's services, during the one-year restricted period.

147. Duford breached the Agreement's employee-and-contractor nonsolicitation restriction because, upon information and belief, during the two-year restricted period he recruited, engaged, and offered a service relationship to Heuvel, a covered Brand Leader employee, to serve as a principal of Ghost, and thereafter publicly operated Ghost with Heuvel as one of its two principals, after having agreed not to recruit, employ, offer a service relationship to, or otherwise engage covered Brand Leader employees and independent contractors.

148. Duford further breached the Agreement by creating and launching the Toxxic Coffee brand as undisclosed moonlighting during his employment, contrary to his obligation to devote his full-time attention to Brand Leader and avoid conflicts of interest, and by failing to treat that brand and related work product as belonging to Brand Leader under the Agreement's assignment provisions.

149. Duford breached the Agreement's customer-and-prospective-customer nonsolicitation restriction by contacting Brand Leader client contacts through his personal email account on December 7, 2025, before the conclusion of his employment, emphasizing that his personal relationships with them would continue and that he was not walking away from those relationships.

150. On December 8, 2025, after announcing his departure, Duford separately contacted a Brand Leader prospect regarding that prospect's business opportunity.

151. The Agreement also included an implied covenant of good faith and fair dealing requiring Brand Leader and Duford to exercise their contractual rights and perform their contractual duties honestly, fairly, and in a manner consistent with the Agreement's purpose of protecting Brand Leader's legitimate business interests, property, confidential information, work product, goodwill, and customer relationships.

152. Duford further breached the Agreement by breaching that implied covenant, acting in bad faith to frustrate the Agreement's purpose and deprive Brand Leader of the benefits of its bargain. Among other things, while still employed by Brand Leader, Duford publicly displayed Brand Leader-associated client work on his personal professional-services website; contacted Brand Leader client contacts through his personal email account while emphasizing that his personal relationships with them would continue after his departure; and separately communicated with a Brand Leader prospect concerning that prospect's business opportunity after announcing his departure.

153. Duford further acted in bad faith by retaining, copying, transmitting, reproducing, incorporating into later products, or continuing to use Brand Leader digital files, creative materials, source materials, confidential information, AI-related materials, AI agents, or other company property after Brand Leader demanded the return of its property, and thereafter by using, or causing competing businesses with which he was associated to use, Brand Leader-associated client work, creative assets, project

histories, and goodwill as commercial credentials to promote competing agency services.

154. That conduct was not a good-faith performance of Duford's contractual duties. Rather, it undermined Brand Leader's contractual right to protect its property, Proprietary Information, customer relationships, work product, and goodwill.

155. As a direct and proximate result of Duford's breaches, Brand Leader has suffered and continues to suffer damages, including lost business opportunities and profits, loss or impairment of the exclusive value of its proprietary information and work product, unjust benefits obtained through the use of Brand Leader assets, and injury to Brand Leader's customer relationships, competitive position, and goodwill.

156. Because Duford breached his obligations under Sections 3 and 5(a) of the Agreement to devote his full-time attention to Brand Leader, avoid conflicts of interest, and refrain from providing competing services during his employment, Brand Leader did not receive the faithful performance for which it compensated him.

157. Duford has therefore forfeited, and must return to Brand Leader, the salary, bonuses, benefits, and other compensation Brand Leader paid him during the period of those breaches.

158. Duford's contractual breaches are ongoing or threaten to continue because the Agreement's proprietary-information obligations, trade-secret protections, and two-year customer and employee/contractor nonsolicitation restrictions remain operative.

## FOURTH CAUSE OF ACTION — BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT AGAINST DUFORD

159. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

160. Duford caused or participated in the public display of a photograph on The Brand Company's website that was taken at the site of a Brand Leader client and depicted two current Brand Leader employees.

161. The photograph had been altered to add THE BRAND COMPANY logo or mark to the jacket worn by Duford.

162. Neither of the current Brand Leader employees depicted in the photograph consented to the alteration of the jacket to display THE BRAND COMPANY logo or mark, to being depicted alongside a jacket bearing THE BRAND COMPANY logo or mark, or to the use of the altered photograph to advertise or promote The Brand Company or any other business competing with Brand Leader.

163. Duford displayed or caused the display of the doctored photograph to the public, including existing clients of Brand Leader, in connection with the promotion of The Brand Company's competing agency services. See Exhibit N.

164. The alteration and public use of the photograph constituted a fraudulent act accompanying Duford's contractual breach because it was a distinct act of dishonesty and unfair dealing designed to create or reinforce the false appearance that Duford and The Brand Company were responsible for the photograph and photo shoot.

165. Duford acted with fraudulent intent in breaching the Agreement.

166. The timing, manner, and commercial use of the doctored photograph show that Duford intentionally used Brand Leader-associated personnel, client-site imagery, and goodwill to benefit a competing business while concealing or misrepresenting the photograph's true origin and affiliation.

167. The doctored photograph was directly connected in time and character to Duford's contractual breaches because it was used to market The Brand Company while Duford remained subject to the Agreement's obligations.

168. Duford created, displayed, and used the doctored photograph with the intent to breach the Agreement, and the photograph was an instrument of those breaches.

169. Duford intended to use the doctored photograph to Solicit Brand Leader's Customers in violation of Section 4 of the Agreement.

170. By displaying to the public, including Brand Leader's existing clients, an image taken at the site of a Brand Leader client and falsely branded with THE BRAND COMPANY logo or mark, Duford sought to contact and call upon Brand Leader Customers with a view to providing competing services, to divert or attempt to divert the business of Brand Leader Customers from Brand Leader, and to interfere with Brand Leader's relationships with its Customers, all within the two-year period following his separation.

171. By falsely presenting current Brand Leader employees as affiliated with The Brand Company, Duford sought to hold out those employees as part of a competing enterprise and to recruit, offer a service relationship to, or otherwise engage, or create

the appearance of engaging, covered Brand Leader employees for the benefit of The Brand Company during the two-year restricted period.

172. Duford also intended to use the doctored photograph to further his competitive activities in violation of Section 5 of the Agreement by promoting The Brand Company's branding, design, and related agency services during the one-year restricted period, and to exploit Brand Leader work product and client-site imagery contrary to Sections 1 and 2 of the Agreement.

173. The doctored photograph has caused and continues to cause harm to Brand Leader's reputation and goodwill.

174. By falsely presenting a photograph taken at the site of a Brand Leader client and depicting current Brand Leader employees as the work and personnel of The Brand Company, Duford misled Brand Leader's existing and prospective clients about the source of Brand Leader's work and the affiliation of Brand Leader's employees, undermined Brand Leader's standing as the agency responsible for that work, and created the false impression that Brand Leader's personnel and client relationships had moved to a competing enterprise.

175. The doctored photograph has also caused Brand Leader to lose profits.

176. Existing and prospective clients who encountered the doctored photograph were misled into attributing Brand Leader's work and personnel to The Brand Company, and, upon information and belief, business and engagements that Brand Leader would otherwise have obtained were diverted to The Brand Company and Duford, depriving Brand Leader of the revenues and profits it would have earned from that business.

177. As a direct and proximate result of Duford's breach of contract accompanied by a fraudulent act, Brand Leader has suffered damages, including reputational damage, loss of business opportunities, and lost income, in an amount to be established through discovery and trial.

178. Duford's breach was accompanied by fraudulent conduct, entitling Brand Leader to recover all damages available under South Carolina law, including punitive damages.

**FIFTH CAUSE OF ACTION — TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS (HEUVEL) AGAINST ALL DEFENDANTS**

179. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

180. At all relevant times, and continuing to the present, Chris Heuvel has been a current employee of Brand Leader, and Brand Leader and Heuvel have been parties to an agreement for employment under which Heuvel provides design and creative services to Brand Leader in exchange for compensation paid by Brand Leader.

181. That agreement is a valid and enforceable contract between Brand Leader and Heuvel.

182. As a current employee of Brand Leader, and like all Brand Leader employees, Heuvel owes Brand Leader the faithful performance of his services and a duty of loyalty.

183. That duty prohibits Heuvel from accepting or performing competitive work, whether as moonlighting, side work, or otherwise, and from providing creative, design,

art-direction, or other services to a competing agency while employed by and compensated by Brand Leader.

184. Duford enticing Heuvel to be a principal of Ghost, responsible for Ghost's creative execution, art direction, and design systems, constitutes competitive moonlighting caused by Defendants in breach of his duty of loyalty and his agreement for employment with Brand Leader.

185. Defendants knew of Brand Leader's contract with Heuvel.

186. Duford worked directly with Heuvel at Brand Leader, co-authored The Brand Book with Heuvel while both were employed by Brand Leader, and had previously attributed Brand Leader's Spero design work to Heuvel.

187. Duford's knowledge is attributable to The Brand Company and Ghost, which act through him.

188. Defendants intentionally procured and induced Heuvel's breach of his contract with Brand Leader by recruiting and engaging Heuvel, while he remained employed by Brand Leader, as a principal of Ghost, a competing creative agency, and by presenting him publicly as responsible for Ghost's creative execution, art direction, and design systems. See Exhibit I.

189. Ghost's public website contains posts dated November 2025 through February 2026, and Ghost holds out Duford and Heuvel as its only two principals and solicits prospective customers to "Book a Call," all while Heuvel remained employed by and was being compensated by Brand Leader. See Exhibits J and K.

190. Defendants have further used Brand Leader work product associated with Heuvel, including Spero, Les Fumées Blanches, Carmichael Training Systems, ONZA,

and other Brand Leader-associated projects, to market the competing services of Ghost and The Brand Company.

191. Defendants' interference was carried out by improper means, including in violation of Section 4(a) of the Agreement, under which Duford agreed that for two years after termination he would not, for himself or on behalf of any Person, directly or indirectly recruit, offer a service relationship to, or otherwise engage any employee of Brand Leader, including Heuvel.

192. Ghost directly benefited from the interference by obtaining Heuvel's creative, design, and art-direction services as one of its two principals.

193. Upon information and belief, The Brand Company, acting through Duford, also participated in, encouraged, and benefited from the interference, including by displaying in its commercial portfolio Brand Leader work product that Duford attributed to Heuvel, including the Spero engagement.

194. Duford is not a party to Brand Leader's contract with Heuvel and personally directed, authorized, and participated in the recruitment and engagement of Heuvel, and is individually liable for that interference.

195. The Brand Company's and Ghost's interference was intentional and without justification.

196. Their conduct was not limited to lawful independent competition.

197. Rather, Defendants used Duford's knowledge of and working relationship with Heuvel, gained through his senior position at Brand Leader, to divert Heuvel's services to a competing enterprise while Heuvel remained employed by Brand Leader and while Duford was contractually prohibited from recruiting or engaging him.

198. Defendants' conduct intentionally procured or substantially caused Heuvel's breach of his contract with Brand Leader.

199. As a direct and proximate result of Defendants' intentional and unjustified interference with Brand Leader's contract with Heuvel, Brand Leader has suffered and continues to suffer damages, including loss of the faithful and exclusive services of Heuvel, diversion of Brand Leader's creative capacity to a competing enterprise, harm to its client relationships and goodwill, and other damages in an amount to be established at trial.

**SIXTH CAUSE OF ACTION — BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY AGAINST DUFORD**

200. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

201. During his employment with Brand Leader, Duford served in senior positions of trust, including President from January 2023 through January 2025.

202. Although Duford was never a partner of Brand Leader, from January 2025 through December 2025 he referred to himself as a "Partner" of Brand Leader while continuing to serve in a senior position of trust.

203. Through those roles, Duford obtained access to Brand Leader's clients, prospective clients, personnel, proprietary information, creative work, marketing strategies, technology resources, business-development opportunities, and other business assets.

204. By virtue of his senior leadership roles, agency relationship, and access to Brand Leader's business assets and opportunities, Duford owed Brand Leader fiduciary

duties and a duty of loyalty, including duties to act in Brand Leader's best interests; refrain from self-dealing and competition adverse to Brand Leader during his employment; protect Brand Leader's property, confidential information, goodwill, and client relationships; and disclose business opportunities belonging to Brand Leader rather than appropriating them for himself or competing enterprises.

205. Duford breached those duties by forming, leading, and operating a competing agency while still employed by Brand Leader.

206. The Brand Company was formed as a South Carolina limited liability company on September 30, 2025, while Duford remained employed by Brand Leader in a senior position of trust.

207. Duford publicly represents that he founded The Brand Company in September 2025, approximately three months before his separation from Brand Leader. See Exhibit A.

208. By his own account, Duford therefore founded and led a competing agency while simultaneously serving Brand Leader in a senior leadership role and accepting compensation from Brand Leader.

209. The Brand Company offers services materially overlapping Brand Leader's branding, advertising, marketing, strategy, design, website, and AI-related services, and Duford intentionally selected for it a name closely resembling Brand Leader's THE Brand Leader mark.

210. Duford did not disclose The Brand Company's formation or his role as its founder to Brand Leader during his employment.

211. Duford further breached those duties while still employed by Brand Leader by publicly displaying Brand Leader-associated client work on his personal professional-services website, including Spero work that identified Duford and Heuvel, a Brand Leader employee, as collaborators, while presenting his professional services and portfolio to the public.

212. On December 7, 2025, before his separation from Brand Leader, Duford used his personal email account to contact Brand Leader client contacts regarding his departure, emphasized that his personal relationships with them would continue, and stated that he was not walking away from those relationships.

213. On December 8, 2025, Duford separately communicated with a Brand Leader prospect concerning that prospect's business opportunity after announcing that he was leaving Brand Leader.

214. While employed by Brand Leader, Duford also had access to and used Brand Leader's technology and artificial-intelligence resources; developed AI-related tools; and transmitted prompts for personal AI tools that included internal Brand Leader information.

215. Brand Leader invested its resources in those tools, systems, and related business-development efforts.

216. While employed by Brand Leader, Duford also created and launched the Toxxic Coffee brand without disclosing it to Brand Leader, describing it only after its launch as moonlighting or a "side hustle" and thereafter used that work to promote himself and competing enterprises.

217. Upon information and belief, Duford created or participated in creating the Ghost venture, operating under the Ghost and “weareghosts” names, at least one (1) year before his separation from Brand Leader.

218. The existence of that competing creative-agency venture throughout Duford’s final year of employment shows that, during that entire period, Duford was acting against Brand Leader’s interests and in furtherance of a competing enterprise while continuing to accept compensation from Brand Leader.

219. Shortly after his separation, Duford accepted a senior client-facing position with another agency and became publicly associated with The Brand Company and Ghost, enterprises offering services that compete with Brand Leader.

220. Those enterprises used Brand Leader-associated client work, creative assets, project histories, and goodwill as credentials to market and obtain competing agency business.

221. Duford further breached his fiduciary duties and duty of loyalty by retaining, copying, transmitting, reproducing, incorporating into later products, or continuing to use Brand Leader digital files, creative materials, source materials, confidential information, AI-related materials, AI agents, or other company property after Brand Leader demanded the return of its property.

222. Duford’s conduct was undertaken for his own benefit and for the benefit of competing enterprises, was adverse to Brand Leader’s interests, and deprived Brand Leader of the faithful and loyal services to which it was entitled during Duford’s employment.

223. Because Duford breached his fiduciary duties and duty of loyalty while employed by Brand Leader, he forfeited, and is not entitled to retain, the compensation Brand Leader paid him during the period of his disloyalty, which began no later than November 14, 2024, when the wearghosts.co domain associated with the Ghost venture was registered, and continued through his separation from Brand Leader in December 2025.

224. Brand Leader is entitled to recover from Duford all salary, bonuses, benefits, and other compensation paid to him during that period, including, at a minimum, all compensation paid to him during the period preceding his separation, during which he was operating the Ghost venture and otherwise against Brand Leader's interests.

225. As a direct and proximate result of Duford's breach of fiduciary duty and duty of loyalty, Brand Leader has suffered and continues to suffer damages, including lost business opportunities and profits, impairment of customer and prospective-customer relationships, loss of the exclusive value of its proprietary information and work product, unjust benefits obtained by Duford and competing enterprises, and injury to Brand Leader's competitive position and goodwill.

**SEVENTH CAUSE OF ACTION — USURPATION OF CORPORATE OPPORTUNITIES AGAINST DUFORD**

226. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

227. During his employment and service in senior leadership positions at Brand Leader, Duford had access to Brand Leader's existing and prospective client

relationships, business-development pipeline, client needs, referral sources, creative and technology resources, and opportunities for branding, design, website, strategy, and AI-related services.

228. Brand Leader had a legitimate interest and reasonable expectancy in business opportunities arising from its client and prospective-client relationships, including the Thompson Holdings/Watermark website-redesign opportunity.

229. Brand Leader likewise had a legitimate interest and reasonable expectancy in the anticipated new project contract with Addra Bars, an existing Brand Leader client for which Brand Leader had performed brand and packaging work at reduced rates in anticipation of future business, and which Duford reported as late as December 2025 might sign a new project contract with Brand Leader.

230. Upon information and belief, Duford diverted that opportunity to himself or to a competing enterprise.

231. Brand Leader likewise had a legitimate interest and reasonable expectancy in the publishing and related commercial opportunities arising from Branding Without Permission, which Duford developed and promoted while employed by Brand Leader, using goodwill and exposure generated through Brand Leader's investment in its book projects, and which Duford pursued for himself without disclosing the opportunity to Brand Leader.

232. Duford had direct access to information concerning those opportunities through his position at Brand Leader.

233. Rather than present and preserve those opportunities solely for Brand Leader's benefit, Duford used his access to Brand Leader's clients, prospects, work

product, technology resources, goodwill, and business-development information to prepare, facilitate, and promote competing business activities during and immediately following his employment.

234. Duford's communications with Brand Leader clients and prospects immediately before his separation, his personal commercial portfolio displaying Brand Leader-associated work, his development and use of AI-related tools while using Brand Leader resources, and his association with competing agency businesses support the reasonable inference that he diverted, appropriated, or attempted to appropriate business opportunities properly belonging to Brand Leader.

235. Duford further used, or caused competing enterprises to use, Brand Leader-associated client work, project histories, and goodwill as commercial credentials to solicit and obtain competing agency business.

236. The Brand Company and Ghost publicly displayed former Brand Leader-related projects while marketing overlapping creative-agency services.

237. Duford's appropriation and attempted appropriation of Brand Leader's corporate opportunities was undertaken without Brand Leader's knowledge or consent and for Duford's personal benefit and the benefit of competing enterprises with which he was associated.

238. As a direct and proximate result of Duford's usurpation of corporate opportunities, Brand Leader has suffered and continues to suffer damages, including lost business opportunities, lost profits, loss of client and prospective-client relationships, unjust enrichment, injury to Brand Leader's competitive position, and harm to Brand Leader's goodwill.

## EIGHTH CAUSE OF ACTION — MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT AGAINST DUFORD

239. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

240. Brand Leader owns trade secrets consisting of nonpublic client and prospective-client information, including customer contact information and the identities of key decision-makers at Brand Leader's customers and prospective customers; customer-specific marketing strategies developed for Brand Leader's clients; Brand Leader's internal processes, methodologies, and procedures for developing and creating marketing plans; business-development information and pipeline data, marketing plans, pricing information, designs, strategies, software, AI-related materials and tools, source materials, work product, and other confidential commercial information that derives independent economic value from not being generally known to or readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use.

241. Brand Leader took reasonable measures under the circumstances to maintain the secrecy of its trade secrets.

242. Those measures included limiting Duford's access through his employment relationship; requiring him by written agreement to protect Brand Leader's Trade Secrets and Proprietary Information; requiring the return of Brand Leader materials and property upon separation; and prohibiting the continued use of qualifying Trade Secrets and Proprietary Information after his employment ended.

243. Duford acquired access to Brand Leader's trade secrets through his senior positions and subject to duties to maintain their confidentiality and to return Brand Leader property and materials.

244. Brand Leader did not authorize Duford to retain, use, disclose, copy, transmit, reproduce, incorporate into later products, or otherwise exploit Brand Leader's trade secrets for his own benefit or for the benefit of a competing enterprise after his employment ended.

245. Duford misappropriated Brand Leader's trade secrets by, among other things, transmitting prompts used for his personal artificial-intelligence tools that included internal Brand Leader information.

246. By incorporating internal Brand Leader information into prompts for tools that he built and controlled for his own benefit, rather than for Brand Leader, Duford used and disclosed Brand Leader's trade secrets without Brand Leader's express or implied consent and in breach of his duty to maintain their secrecy and limit their use.

247. Upon information and belief, the personal artificial-intelligence tools for which Duford transmitted those prompts include or contributed to the artificial-intelligence tools and "custom AI" capabilities that Duford and his associated competing enterprises have since advertised alongside services competing directly with Brand Leader.

248. On information and belief, after Brand Leader demanded the return of its property, Duford retained, used, disclosed, copied, transmitted, reproduced, incorporated into later products, or otherwise benefited from Brand Leader trade secrets

in connection with competing branding, design, strategy, website, and AI-related activities.

249. Duford's pre-separation access to Brand Leader's client and prospective-client relationships, proprietary work, business-development information, technology resources, and AI-related tools, coupled with his immediate post-separation competitive activities, shows that his misappropriation has occurred and threatens to continue.

250. Duford knew or had reason to know that the information he acquired through his employment with Brand Leader was confidential, proprietary, and protected from unauthorized use or disclosure.

251. Brand Leader's trade secrets are related to Brand Leader's products and services used in, or intended for use in, interstate commerce, including the branding, advertising, marketing, design, and website services that Brand Leader provides, and that Duford helped provide, to clients located throughout the United States.

252. An owner of a trade secret may bring a civil action for misappropriation when the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 USCS § 1836.

253. Duford's acquisition, retention, use, and threatened use or disclosure of Brand Leader's trade secrets without Brand Leader's consent constitute misappropriation under the Defend Trade Secrets Act.

254. As a direct and proximate result of Duford's misappropriation and threatened misappropriation, Brand Leader has suffered and continues to suffer damages, including actual loss, unjust enrichment not otherwise addressed by actual-loss damages, lost business opportunities and profits, impairment of the exclusive value

of its trade secrets and work product, injury to customer and prospective-customer relationships, and harm to its competitive position and goodwill.

255. Duford's conduct has caused and threatens irreparable injury for which monetary damages alone are inadequate.

256. Brand Leader is entitled to injunctive relief and to recover damages, exemplary damages, and reasonable attorneys' fees to the extent authorized by law.

## NINTH CAUSE OF ACTION — MISAPPROPRIATION OF TRADE SECRETS UNDER THE SOUTH CAROLINA TRADE SECRETS ACT AGAINST DUFORD

257. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

258. The information identified herein constitutes trade secrets under the South Carolina Trade Secrets Act because it derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, persons who could obtain economic value from its disclosure or use, and because Brand Leader made reasonable efforts under the circumstances to maintain its secrecy.

259. Duford acquired Brand Leader's trade secrets through his employment and position of trust, with knowledge of his duties to maintain their confidentiality, protect them from unauthorized use or disclosure, and return Brand Leader property and materials upon separation.

260. Duford misappropriated Brand Leader's trade secrets by, among other things, transmitting prompts used for his personal artificial-intelligence tools that included internal Brand Leader information, thereby using and disclosing Brand

Leader's trade secrets without Brand Leader's consent, for his own benefit, and in breach of his duty to maintain their secrecy and limit their use.

261. Upon information and belief, those tools include or contributed to the artificial-intelligence tools and "custom AI" capabilities that Duford and his associated competing enterprises have since advertised in competition with Brand Leader.

262. On information and belief, Duford misappropriated Brand Leader's trade secrets by retaining, using, disclosing, copying, transmitting, reproducing, incorporating into later products, or otherwise exploiting them without Brand Leader's consent after his employment ended, including in connection with competing agency and AI-related activities.

263. Duford knew or had reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

264. Duford's misappropriation has caused and threatens to continue causing Brand Leader irreparable harm, including loss of the exclusive value of its trade secrets, loss of business opportunities and profits, unjust enrichment, impairment of customer and prospective-customer relationships, injury to Brand Leader's competitive position, and harm to its goodwill.

265. As a direct and proximate result of Duford's misappropriation, Brand Leader has suffered and continues to suffer damages in an amount to be established through discovery and trial.

266. As a direct and proximate result of Defendants' misappropriation, Brand Leader is entitled to recover its actual losses and Defendants' unjust enrichment not otherwise accounted for in calculating Brand Leader's actual losses, or, where

appropriate, a reasonable royalty for Defendants' unauthorized disclosure or use of Brand Leader's trade secrets.

267. Brand Leader is further entitled to injunctive relief against actual or threatened misappropriation.

268. To the extent Defendants' conduct was willful, wanton, or in reckless disregard of Brand Leader's rights, Brand Leader seeks exemplary damages together with reasonable attorneys' fees.

**TENTH CAUSE OF ACTION — SOUTH CAROLINA COMMON-LAW TRADEMARK INFRINGEMENT AGAINST DUFORD AND THE BRAND COMPANY**

269. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

270. Brand Leader has used the THE Brand Leader name and mark in connection with its branding, advertising, marketing, creative, design, web-development, and related agency services.

271. Through its continuous use of the THE Brand Leader name and mark, Brand Leader has developed substantial goodwill, reputation, and source-identifying significance in the mark among its customers, prospective customers, and the relevant marketplace.

272. Duford and The Brand Company offer or promote services that overlap with Brand Leader's agency services, including branding, brand strategy, design, marketing, website development, creative services, and artificial-intelligence-related services.

273. The Brand Company adopted and uses THE BRAND COMPANY, a designation that employs the same prominent "THE BRAND" wording and a substantially similar commercial impression as Brand Leader's THE Brand Leader mark, in connection with competing agency services.

274. Duford selected THE BRAND COMPANY name while associated with a business offering services that compete with Brand Leader, and he publicly identified himself as The Brand Company's Founder beginning in September 2025.

275. Duford and The Brand Company have compounded the likelihood of confusion by using Brand Leader-associated client work, creative assets, project histories, and goodwill as commercial credentials for competing agency businesses.

276. Duford's personal portfolio and The Brand Company's commercial portfolio display projects associated with Brand Leader clients or developed during Duford's employment with Brand Leader, including but not limited to Spero, ONZA, Toxxic Coffee, Les Fumées Blanches, VintageView, Verdeco, In Good Taste, Carmichael Training Systems, and Ventura County Coast.

277. Duford's personal portfolio displays Brand Leader-associated work on which THE Brand Leader name and Brand Leader monogram remain visibly displayed, while promoting Duford's own professional portfolio and services.

278. The Brand Company's portfolio identifies Duford, but not Brand Leader, as part of the project team for the Spero work; represents that "we" gave Spero a "full transformation"; and displays project-process materials, mockups, descriptions, and other materials associated with the Spero engagement.

279. The use by Duford and The Brand Company of THE BRAND COMPANY designation, Brand Leader-associated work, and Brand Leader's goodwill in marketing overlapping services is likely to cause confusion, mistake, or deception among actual and prospective customers concerning the source, affiliation, sponsorship, approval, or association of their services and portfolios with Brand Leader.

280. The conduct of Duford and The Brand Company constitutes common-law trademark infringement because it improperly appropriates, and threatens to continue appropriating, the goodwill associated with Brand Leader's THE Brand Leader mark and services.

281. As a direct and proximate result of the conduct of Duford and The Brand Company, Brand Leader has suffered and continues to suffer damages, including loss of business opportunities, lost profits, injury to its goodwill and reputation, impairment of the distinctiveness and source-identifying value of its mark, and unjust benefits obtained by Duford and The Brand Company.

**ELEVENTH CAUSE OF ACTION — VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT AGAINST ALL DEFENDANTS**

282. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

283. Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices by adopting and using THE BRAND COMPANY in connection with agency services that overlap with Brand Leader's services while using Brand Leader-associated client work, creative assets, project histories, and goodwill to market those competing services.

284. Defendants' public presentation of Brand Leader-associated work as credentials for competing businesses is deceptive and unfair.

285. The Brand Company's portfolio presents Brand Leader-associated projects as its own work, including Spero materials stating that "we" gave Spero a "full transformation," while omitting Brand Leader's role in the engagement.

286. Duford's personal portfolio has displayed Brand Leader-associated work bearing Brand Leader's name and monogram while promoting Duford's own professional services, and Ghost has displayed former Brand Leader-related projects while marketing its competing creative-agency services.

287. Defendants' use of the closely structured THE BRAND COMPANY designation, their overlapping agency services, and their commercial presentation of Brand Leader-associated work have created and threaten to continue creating confusion among customers and prospective customers concerning the source, affiliation, sponsorship, approval, and association of Defendants' services and portfolios.

288. Defendants' conduct affects the public interest because Defendants use their commercial websites and other public-facing marketing channels to solicit agency clients and promote competing branding, design, strategy, website, creative, and artificial-intelligence-related services to the public.

289. The challenged conduct is ongoing and has the potential for repetition in Defendants' continued advertising, solicitations, and promotion of their services.

290. Brand Leader has suffered ascertainable losses of money and property as a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, including lost business opportunities and profits, injury to

Brand Leader's goodwill and reputation, impairment of the value and distinctiveness of the THE Brand Leader mark, and unjust benefits obtained by Defendants.

291. Defendants' conduct was willful and knowing.

292. Duford was a senior Brand Leader employee who, although never a partner of Brand Leader, referred to himself as a partner; had access to Brand Leader's client work, goodwill, branding, and proprietary business assets; selected THE BRAND COMPANY name; publicly associated himself with The Brand Company; and participated in using Brand Leader-associated work to market competing services.

293. Brand Leader is entitled to recover actual damages, treble actual damages, and reasonable attorneys' fees and costs.

**TWELFTH CAUSE OF ACTION — TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS AGAINST ALL DEFENDANTS**

294. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

295. Brand Leader had identifiable, genuine, and non-speculative prospective contractual relationships with Thompson Holdings, Inc. and others concerning a website-redesign opportunity for Watermark Design Group (the "Prospective Opportunities").

296. Before his separation from Brand Leader, Duford acquired direct knowledge of and access to the Prospective Opportunities through his senior position at Brand Leader and his involvement in Brand Leader's client-development activities.

297. A November 18, 2025 calendar event entitled "Meeting with Kyle at Brand Leader" concerned a Thompson Holdings representative seeking a website redesign for

Watermark Design Group following a referral arising from earlier work associated with Brand Leader, and the meeting link carried Duford's name.

298. Brand Leader had a reasonable expectation of receiving the business associated with the Thompson Holdings/Watermark opportunity because the opportunity arose from a referral based on earlier work associated with Brand Leader, involved a representative seeking Brand Leader's website-redesign services, and was the subject of a meeting scheduled through Brand Leader.

299. Duford intentionally interfered with Brand Leader's Prospective Opportunities by using information, relationships, and access obtained through his Brand Leader employment to communicate separately with the Brand Leader prospect and to position himself, The Brand Company, Ghost, and other competing agency activities to obtain business opportunities that properly belonged to Brand Leader.

300. Duford's interference was undertaken for an improper purpose and by improper methods.

301. While still employed by Brand Leader and obligated to act loyally and protect Brand Leader's business interests, Duford used his personal email account to contact Brand Leader client contacts concerning his departure, emphasized that his personal relationships with them would continue.

302. Duford's improper methods further included using Brand Leader-associated client work, creative assets, project histories, goodwill, and prospective-client information to promote competing services while creating or facilitating competing ventures.

303. The Brand Company and Ghost offer branding, strategy, design, website, creative-agency, and artificial-intelligence-related services that overlap with Brand Leader's services.

304. The Brand Company and Ghost intentionally participated in, assisted, encouraged, ratified, and benefited from Duford's interference with Brand Leader's Prospective Opportunities.

305. Each entity publicly used Brand Leader-associated work and goodwill to market competing services and solicit prospective agency clients, while publicly associating Duford with its competing business activities.

306. The Brand Company and Ghost acted through Duford and other persons acting on their behalf.

307. Duford publicly represented that he founded The Brand Company in September 2025, and Ghost publicly identifies Duford as one of its two principals responsible for strategy.

308. Defendants' conduct was not legitimate competition undertaken through proper means.

309. Rather, Defendants exploited Brand Leader's prospective-client relationships, business-development efforts, client history, confidential business information, creative work, and goodwill for the purpose of diverting or securing business opportunities from the Prospective Opportunities.

310. But for Defendants' improper interference, Brand Leader had a reasonable expectation of continuing to pursue, develop, and obtain contractual business through the Prospective Opportunities.

311. As a direct and proximate result of Defendants' intentional interference with Brand Leader's Prospective Opportunities, Brand Leader has suffered and continues to suffer damages, including loss of prospective business, lost profits, lost business-development expenditures, impairment of customer and prospective-customer relationships, injury to Brand Leader's competitive position, and harm to its goodwill.

**THIRTEENTH CAUSE OF ACTION — UNJUST ENRICHMENT**

312. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

313. Brand Leader conferred non-gratuitous benefits upon Duford, including the provision of corporate funds, paid software subscriptions, company-funded promotional materials, and compensated time.

314. Specifically, Brand Leader paid for Duford's access to artificial-intelligence research platforms, including an Anthropic account, which Duford utilized daily for his own research and development.

315. Duford also utilized Brand Leader corporate funds via Ramp cards to pay for the Lovable platform, which he used to build his personal artificial-intelligence tools and audit infrastructure.

316. Furthermore, Brand Leader funded The Brand Book and, at Duford's direction over approximately two years, shipped physical copies of it at Brand Leader's expense to Brand Leader clients and prospective clients to secure business for Brand Leader.

317. Since his separation, Duford has used The Brand Book to secure business for himself, kyleduford.com, Ghost, and The Brand Company, and, upon information and belief, to promote paid speaking engagements and sell branding work and artificial-intelligence tools, without providing any value to Brand Leader.

318. Duford realized, accepted, and retained these financial and material benefits by using them to offset his own development costs, build infrastructure for his competing ventures, and solicit his own prospects.

319. Duford has retained these benefits without compensating Brand Leader for their value.

320. Under these circumstances, including Duford's immediate transition to competing agency ventures and his unauthorized exploitation of Brand Leader's resources to facilitate that competition, it would be inequitable and unjust for Duford to retain these benefits without paying Brand Leader for their full value.

321. As a direct and proximate result of Duford's unjust enrichment, Brand Leader has suffered damages and is entitled to restitution and the disgorgement of the financial benefits conferred, in an amount to be established at trial.

**FOURTEENTH CAUSE OF ACTION — ACCOUNTING**

322. Plaintiff repeats and realleges the preceding allegations of this Complaint as though fully set forth herein.

323. During his employment as President of Brand Leader and thereafter as a senior employee who, although never a partner, referred to himself as a “Partner” of Brand Leader, Duford occupied a position of trust and owed fiduciary duties and a duty of loyalty to Brand Leader.

324. Duford breached those duties by engaging in self-dealing, misappropriating Brand Leader's corporate funds and resources, and diverting Brand Leader's corporate opportunities for his personal benefit and the benefit of his competing ventures.

325. Specifically, Duford utilized Brand Leader's corporate funds and paid software subscriptions, including Ramp cards and Anthropic artificial-intelligence accounts, to develop his own competing tools and infrastructure, and, following his separation, has used The Brand Book, a Brand Leader-funded publication, to secure business, speaking engagements, and sales of branding work and artificial-intelligence tools for himself and his competing ventures without compensating Brand Leader.

326. Duford further used his position and access to Brand Leader's business-development pipeline to divert Brand Leader's prospective client opportunities, including the Prospective Opportunities, to himself and his competing agency businesses.

327. Brand Leader does not know, and cannot reasonably ascertain without a formal accounting, the full extent of the corporate funds and resources Duford expended for his personal benefit, the precise digital and physical property he retained, or the total profits, revenues, and financial benefits he and his competing ventures have realized as a result of his wrongful conduct.

328. Because of Duford's breach of his fiduciary duties and the concealed, complex nature of his expenditures, retained property, and diverted business opportunities, Brand Leader lacks an adequate remedy at law to determine the exact amount of the financial harm it has suffered or the extent of Duford's unjust enrichment.

329. Accordingly, Brand Leader is entitled to a full equitable accounting of all Brand Leader funds expended, property retained, and profits and benefits derived by Duford and his associated enterprises as a result of his wrongful conduct, and to a judgment requiring the relinquishment of the balance ascertained to be due to Brand Leader.

**WHEREFORE**, Plaintiff The Brand Leader, Inc. respectfully requests that the Court enter judgment in its favor and against Defendants Kyle Duford, individually, Ghost, LLC, and The Brand Company LLC, and award the following relief:

A. That the Court adjudge and decree that Defendants have engaged in the unlawful acts and practices alleged herein;

B. That the Court issue temporary, preliminary, and permanent injunctive relief as permitted by law, including enjoining Defendants and all persons acting in concert with them from using, displaying, copying, reproducing, transmitting, retaining, distributing, marketing, or exploiting Plaintiff's marks, copyrighted works, trade secrets, confidential information, proprietary information, work product, client materials, or other property, and from otherwise continuing the conduct alleged herein;

C. That the Court order Defendants to return to Plaintiff all tangible and electronically stored property, data, files, credentials, passwords, source materials, software, access rights, confidential information, proprietary information, trade-secret materials, and all copies thereof belonging to Plaintiff or derived from Plaintiff's business, and to certify under oath that all such materials have been returned, deleted, and no longer retained, used, or accessible by Defendants;

D. That the Court order Defendants to account for and disgorge all revenues, profits, compensation, fees, and other benefits unjustly obtained as a result of the acts alleged herein, including compensation provided to Duford during the time of his breach of fiduciary duty and breach of loyalty;

E. That the Court impose a constructive trust in favor of Plaintiff upon all revenues, profits, compensation, fees, business opportunities, client relationships, contracts, intellectual property, software, artificial-intelligence tools, and other property and proceeds obtained by Defendants, directly or indirectly, through the use of Plaintiff's property, confidential information, trade secrets, work product, corporate opportunities, or goodwill, or through Duford's breaches of fiduciary duty and the duty of loyalty, and order that Defendants hold all such property and proceeds in trust for Plaintiff's benefit and convey them to Plaintiff;

F. That Plaintiff recover all actual, compensatory, consequential, incidental, and special damages allowed by law in an amount to be determined at trial;

G. That Plaintiff recover Defendants' profits, unjust enrichment, and any other monetary recovery available under the Lanham Act, the Defend Trade Secrets Act, the South Carolina Trade Secrets Act, and other applicable law;

H. That Plaintiff recover treble damages, exemplary damages, and punitive damages to the extent authorized by applicable law;

I. That the Court award Plaintiff its reasonable attorneys' fees, costs, expenses, and disbursements incurred in this action;

J. That the Court award pre-judgment and post-judgment interest as allowed by law;

K. That the Court order such corrective measures as may be necessary to remedy confusion, deception, or misuse arising from Defendants' conduct, including the removal of infringing, misleading, or unauthorized materials from websites, social-media platforms, portfolios, promotional materials, and other public-facing media;

L. That the Court grant Plaintiff trial by jury on all issues so triable; and

M. That the Court award such other and further legal or equitable relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: November 11, 2026

Respectfully submitted,

KIM AND LAHEY LAW FIRM, LLC

/s/ Douglas W. Kim

Douglas William Kim (Fed. ID No. 9004)
doug@kimandlahey.com
3620 Pelham Road
PMB #213
Greenville, SC 29615
(o) (864) 973-6688

Hunter S. Freeman (Fed. ID No. 9313)
hfreeman@kimandlahey.com

Sara Centioni Kanos (Fed. ID No. 9978)
skanos@kimandlahey.com

Attorneys for the Plaintiff